### THOMPSON et al. v. RAILROAD COMMISSION et al.

#### No. 9900.

Court of Civil Appeals of Texas. Austin.

May 31, 1950.

Rehearing Denied June 21, 1950.

Kelley, Moshiem & Ryan, of Houston, J. T. Suggs, of Dallas, Baker, Botts, Andrews & Parish, of Houston, Wigley, McLeod, Mills & Shirley, of Galveston, Stroud & Dyer, of Dallas, Allen, Gambill & Gambill, Seth Barwise, all of Fort Worth, Kenneth McCalla, Walter Caven, and Austin L. Hatchell, all of Austin, for appellant.

Price Daniel, Atty. Gen., and Durward Goolsby, Asst. Atty. Gen., for Railroad Commission.

Albert G. Walker, of Austin, for Robertson Transports, Inc.

W. D. White, Callaway & Reed, by R. E. Kidwell and O. D. Montgomery, all of Dallas, for Ray Smith Transport Co.

HUGHES, Justice.

Numerous railroad companies, who are appellants, sued the Railroad Commission of Texas and the Ray Smith Transport Company and Robertson Transports, Inc., both of whom are motor carriers, to set aside orders of the Commission, dated April 9, 1949, in which such motor carriers were granted authority to transport certain named acids, caustic soda, and molasses, in liquid form, in bulk in tank trucks to, from and between all points in Texas.

A non-jury trial resulted in a judgment sustaining the attacked orders.

We will discuss and determine each of the eight points upon which this appeal is based.

It is first contended that the Commission was without statutory authority to enter the orders. This question requires construction of Sec. 1(i), Art. 911b, Vernon's Ann.Civ.St., under which the Commission purported to act. This section reads:

"(i) 'Specialized motor carrier' means any person owning, controlling, managing, operating, or causing to be operated any motor-propelled vehicle used in transporting, over any public highway in this State, over irregular routes on irregular schedules, for compensation and for the general public with specialized equipment, property requiring specialized equipment in the transportation and handling thereof; provided, that the term 'specialized motor carrier' as used in this Act shall not apply to motor vehicles operated exclusively within the incorporated limits of cities or towns; and, provided further the term 'specialized motor carrier' as used herein shall include those carriers who engage or desire to engage exclusively in the transportation of livestock, livestock feedstuff, grain, farm machinery, timber in its natural state, milk, wool, mohair, or property requiring specialized equipment as that term is hereinafter defined, or any one, or more, of the foregoing named commodities.

"For the purpose of this Act, the term 'specialized equipment' includes, but is not limited to block and tackle, hoists, cranes, windlasses, gin poles, winches, special motor vehicles, and such other devices as are necessary for the safe and proper loading or unloading of property requiring specialized equipment for the transportation and handling thereof.

"For the purpose of this Act, the term 'property requiring specialized equipment' is limited to (1) oil field equipment, (2) household goods and used office furniture and equipment, (3) pipe used in the con-

struction and maintenance of water lines and pipe lines, and (4) commodities which by reason of length, width, weight, height, size, or other physical characteristic require the use of special devices, facilities, or equipment for their loading, unloading, and transportation.

"For the purpose of this Act, the term 'oil field equipment' means and includes machinery, materials, and equipment incidental to or used in the construction, operation, and maintenance of facilities which are used for the discovery, production, and processing of natural gas and petroleum, and such machinery, materials, and equipment when used in the construction and maintenance of pipe lines."

■ Appellants assert that under the rule of ejusdem generis a proper construction of this statute would prohibit the Commission from authorizing a specialized motor carrier to transport any commodity "except those of the same general nature, or having the same genus as household goods, used office furniture and equipment, pipe and oil field equipment."

Section 1(i) of Art. 911b, copied above, was added by the 47th Legislature in 1941 through the enactment of H.B. 351, p. 713, Acts 1941, the first section of which contained a Declaration of Policy, from which we quote: "It is hereby declared to be the policy of the Legislature to create a class of common carrier motor carriers designated as 'specialized motor carriers' to engage in the business of transporting for compensation or hire over the highways in this State over irregular routes or irregular schedules with 'specialized equipment,' oil field equipment, household goods, and used office furniture and equipment, livestock, milk, livestock feedstuff, grain, farm machinery, timber in its natural state, wool, mohair, pipe used in the construction and maintenance of water lines and pipe lines, and in addition, all commodities which by reason of length, width, weight, height, size, or other physical characteristic, require the use of special devices, facilities, or equipment for their loading or unloading, and all commodities which require special facilities or special motor vehicles for adequate, efficient, or safe transportation; * * *."

This Declaration of Policy would clearly include transportation of the liquids involved here because they, by reason of their physical characteristics, require the use of special facilities for loading and for safe and efficient transportation.

■ This plainly expressed legislative policy and intent must be given effect unless other provisions of the same Act are in conflict therewith. We do not so find them.

■ The common purpose of this Act was to provide for the safe and efficient transportation of commodities having awkward or unusual physical characteristics. Nothing else seemed to matter. It could hardly be contended that there was a grouping of intrinsically related commodities when milk and oil field equipment are mentioned in the same section. The only common denominator which these two commodities have is that the transportation of both, in quantity, is difficult and requires special equipment and facilities.

It would have been virtually impossible for the Legislature to have named all of the commodities which require special transportation equipment. The fact that some of these were specifically mentioned does not detract from the legislative purpose. That they were named is probably accounted for by their importance and thus were readily called to the legislative mind.

■ From 59 C.J. 981-4, as copied in Hurt v. Oak Downs, Tex.Civ.App., 85 S.W.2d 294, loc. cit. 298, suit dismissed by Supreme Court, 128 Tex. 218, 97 S.W. 2d 673, we quote a statement of the rule upon which we base our action in overruling appellants' first point: "* * * The doctrine of ejusdem generis, however, is only a rule of construction, to be applied as an aid in ascertaining the legislative intent, and can not control where the plain purpose and intent of the legislature would thereby be hindered or defeated; nor does this doctrine apply where the specific words of a statute signify subjects greatly different from one another, * * *."

By their second point appellants contend that the orders of the Commission are void since the Commission has not prescribed the rates to be charged by the motor carriers for transportation of the acids, etc.

Application to the Commission to establish rates has been made by the motor carrier appellees.

It is the duty of the Commission to supervise and regulate rates of the appellee motor carriers. Sec. 4(a), Art. 911b, V.A.C.S.

The fact that the Commission issues the order or certificate before rates are prescribed does not render the order or certificate void. Texas & Pac. Ry. Co. v. Railroad Commission, Tex.Civ.App., 213 S.W.2d 99, Austin C.C.A. Writ Ref. N.R.E.

The third point urged that the orders are void because they did not comply with Sec. 5a(d), Art. 911b, providing that a certificate shall be void unless the order under which it is issued sets forth full and complete findings of fact pointing out in detail the inadequacies of the services and facilities of the existing carriers, and the public need for the proposed service.

The orders bespeak disproof of this point. We quote from them:

"The Commission further finds from the evidence that Applicant presented witnesses who testified as to the need for the proposed service, said witnesses being representatives of various chemical industries located in various parts of the State of Texas and engaged in the manufacture, sale, distribution and handling of the chemicals hereinabove set out, * * * that the evidence of each and all of said witnesses was along the same general line as to the need for the proposed service, which, in addition to other matters, was as follows: that they had been handling said chemicals in tank cars * * * that there had been delay in transportation of said chemicals by using tank cars, in that the supply of such cars were short at times and they were unable to secure same as and when needed * * * that many of their customers were not located on rail lines and could not, therefore, secure the delivery of chemicals by the use of tank cars; that, if the proposed service is authorized, chemicals can be delivered to such customers by tank trucks, and it will also be possible to build up an additional market for said products and make it much more economical for said customers * * * that the proposed service is needed as a supplement to the tank car service now available; that at times tank cars were hard to get and inconvenience was suffered as a result thereof * * * that, by the use of a tank truck service, a market could be developed off rail lines * * * that the proposed service would aid materially in getting new customers * * * that they had had some experience in the movement with tank trucks and that it was a great convenience to the companies and to the customers * * * that they need the proposed service in their business; that they would like to have the service of more than one carrier; that the movement of some said chemicals is to oil fields that are not served by railroads * * * that it would be a convenience to have tank truck service available for them and their customers; that it would also be economical to have such service; * * * that such service would be an advantage to a customer who is not presently receiving liquid chemicals in tank trucks * * * that the time element is very important in the chemical business; that there is a need for the type of service proposed; that, if said service is made available they will use it; that such service will be a convenience to them and would be used if it is made available; that such service would enable them to have customers off the rail lines, also such customers that are small and don't have the money to buy a full tank car of these materials can be served by tank trucks * * * that the proposed service would be beneficial; that if the proposed type of service were available, their customers could be better served * * * that in point of time tank car service is not equal to the service rendered by the tank trucks * * * that the tank truck service is necessary in order to furnish chemicals to small locations and the proposed service would be convenient * * * that the tank car service has been inadequate * * * that the proposed service would meet a need because of limited

storage facilities of some of the customers; that delays had been experienced in the use of the tank cars and that equipment of that type is sometimes short and unavailable; that by the use of tank trucks, new markets could be opened up which could not now be served by tank car service.

\*    \*    \*    \*    \*    \*

"The Commission further finds from the evidence and its own records, after carefully considering the existing transportation facilities and demand for and the need of the additional service, that the service and facilities of the existing carriers serving the territory are inadequate; and that public convenience will be promoted by granting said application and permitting the operation of motor vehicles on the highways designated in said application as a common carrier for hire."

We consider appellants' argument that the order does nothing more than find that certain witnesses testified to certain facts and does not adopt those facts, to be frivolous. The charge that the Commission idly recited the testimony of these witnesses for no purpose at all is refuted by its own reference to the "evidence" in the last paragraph of the order copied above. The order, as a whole, shows that the Commission adopted as its own findings the testimony of the witnesses set out in the order.

It is contended by the fourth point that the orders are invalid because they do not contain a finding by the Commission "that there exists a public necessity for such service" as required by Sec. 5a(d), Art. 911b.

■ The words "public necessity" were not used by the Commission in its order but when the Commission found that the existing service was inadequate and that the proposed service would be convenient, that there was a need for such service, and that "tank truck service is necessary" we believe this requirement of the statute has received substantial compliance.

The fifth point is that the orders are not supported by substantial evidence. Appellants' argument under this point limits the scope of inquiry because they say they "do not contend that there is no testimony which could be considered to be sufficiently substantial to authorize the Commission to grant motor carrier appellees some type of operating authority," but they "do contend that the evidence which the Commission had before it * * * does not substantially justify the grant of authority to transport all of the chemicals named between all points in Texas irregardless of the origin or destination and irregardless of the existing service between points presently served by appellants and motor carriers already in the field."

■ Lack of evidence as to some of the chemicals relates to certain alcohols such as ethyl alcohol, methyl alcohol, propyl alcohol, etc., which the witnesses did not specifically name.

The chemicals not technically named by the witnesses were properly listed in the applications and appellants do not urge any lack of familiarity with the subject-matter of the extended hearings conducted by the Commission. Considering this and the testimony of Mr. A. Deroen, an employee of the Celanese Corporation of America, that among the chemicals which move from his plant at Bishop, Texas, are "several members of the alcohol family of which we have trade names for," it is our opinion that the alcohols named in the application were sufficiently identified by the evidence.

The other half of this point is that the authority granted is, geographically speaking, too broad. It is quite true that there is no evidence in the record to show a necessity for the proposed service between Hico and Cherokee, or between thousands of other Texas towns. If this sort of evidence is required, then the Commission would be plagued with applications for individual shipments between new points.

■ This requirement would defeat the purpose and letter of the statute which authorize the Commission to issue certificates of this character over irregular routes.

Points six and seven are that the orders are invalid because the Commission, in granting such applications, did not consider (a) the safety of the traveling public, and (b) the effect upon existing carriers.

■ That the Commission did consider the safety of the traveling public is reflected by the following excerpt from its order: "The equipment proposed to be used in said operation meets the requirements of the laws of the State of Texas in regard to safety devices, dimensions, etc., and that the highways designated in the application are of such type of construction and maintenance and subject to such use as to permit the use sought to be made by the applicant without unreasonable interference of the use of such highways by the general public for highway purposes."

■ That the Commission did consider the effect which granting the applications would have upon existing carriers is shown by the following excerpt from its order: "* * * Exhibits were offered by several of said rail lines showing the number of pounds of certain chemicals transported by them in Texas during a certain period of time and the revenues derived therefrom; that said rail lines received a large revenue for the transportation of chemicals in Texas; that the transportation of chemicals is attractive traffic, and that the diversion of the transportation of the tonnage now being transported by said companies would seriously effect the service now being rendered by them; that such traffic is very material to the rail lines; that the rail lines have quite an investment in the terminals located at different points on their lines, and that some of said terminals would have to be abandoned if they lose the chemical traffic; that the revenue received from the transportation of chemicals is a substantial part of the total revenue received by some of said rail lines; that if they lose the chemical transportation they might have to operate a less number of trains and curtail their service to the public; * * *"

Points six and seven are overruled.

The last point is that the motor carrier appellees did not have on hand the necessary and proper equipment to transport the commodities listed in the applications at the time the Commission issued its orders.

Section 13a, Art. 911b, provides that it is the duty of the Commission to "* * * approve or disapprove the nature and character of the equipment to be used under any permit or certificate * * *."

■ There is nothing in this language to even suggest that an applicant must purchase or have on hand such equipment before the certificate is granted and this point is, therefore, overruled.

Having considered and adversely determined all of appellants' points, the judgment of the trial court is affirmed.

Affirmed.

On Appellants' Motion for Rehearing.

In their motion for rehearing appellants say that we have "completely ignored" our own opinion in Texas & Pacific Railway Co. v. Railroad Commission, Tex.Civ.App., 138 S.W.2d 927, which, they say, "declares a certificate issued by the Commission without regulation as to rates is void."

It is true that we did not cite this case, the reasons for which are twofold. In the first place this case went to the Supreme Court, 138 Tex. 148, 157 S.W.2d 622, 626, and that court ordered that the judgment of the Court of Civil Appeals "be reversed, set aside, and held for naught." Furthermore, the Supreme Court there said that, as they understood it, the opinion of the Court of Civil Appeals held "that this permit was illegal in its inception because the Commission failed and refused to hear evidence on, or to consider, the question of public convenience and necessity for its issuance."

These facts are, in our opinion, sufficient justification for our failure to cite such case as authority for or against the point urged by appellants.

We have, however, re-examined the opinion of the Court of Civil Appeals in such case and we find the court saying that a law requiring regulation of rates of certain carriers which did not require regulation of rates of other carriers performing the same services would be discriminatory and invalid and a permit issued under such a law would likewise be invalid. No such question is presented in this case.

■ The record here shows that no rates have been prescribed by the Commission for transportation of any of the com-

146

modities described in the involved permits. Hence it is impossible that there be any discrimination in theory or in fact in favor of or against any carrier transporting such commodities.

The establishment of fair rates for the transportation of new commodities is a complex matter and one requiring careful study by the Commission. Experience is an important factor in rate-determination, and we do not believe the law requires the Commission to act precipitatedly in such matters.

The motion for rehearing is overruled.

Overruled.